UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------X

JERMAINE RIVERA,

                  *Plaintiff*,        **MEMORANDUM & ORDER**

   – against –        22-CV-2233(KAM)(VMS)

POLICE OFFICER TAHA JAHMI, in his
individual and official capacities,
SERGEANT IMAD BEYDOUN, in his
individual and official capacities,
POLICE OFFICER MARCO MONTE, in his
individual and official capacities,
and THE CITY OF NEW YORK,

                  *Defendants*.

--------------------------------X

**KIYO A. MATSUMOTO**, *United States District Judge*:

    On April 19, 2022, Plaintiff Jermaine Rivera ("Plaintiff" or "Rivera") commenced this action against New York City Police Department ("NYPD") Officer (now Sergeant) Taha Jahmi ("Jahmi"), NYPD Sergeant Imad Beydoun ("Beydoun"), and the City of New York.  On April 21, 2023, Rivera filed an amended complaint naming an additional defendant, NYPD Officer Marco Monte ("Monte"), with the previously named defendants (together with Jahmi, Beydoun, and the City of New York, "Defendants").

    Before the Court is Defendants' motion for summary judgment and the parties' submissions on the motion.  (ECF Nos. 64-74.)

For the reasons set forth below, Defendants' motion for summary judgment is GRANTED.

## BACKGROUND

I.  **RIVERA'S ARREST, DEBRIEFING, AND STATE CRIMINAL PROCEEDINGS**

    A.  **The Events of February 12, 2021**

        1.  **Events Occurring Near 78th Street and 12th Avenue**

            a.  **Jahmi, Monte, and Beydoun Approach Rivera's BMW, Observed to Be Double Parked, with Apparent Illegal Window Tints, and an Illegal License Plate Cover**

Unless otherwise noted, the following facts are deemed undisputed based on the parties' submissions, including screenshots excerpted from undisputed body worn camera footage from the officers at the scene of the incident giving rise to this action on February 12, 2021. (*See* ECF No. 69 at 5 (noting "the Parties do not dispute the accuracy of any of the videos"); *see also* ECF No. 68-4 (Beydoun Dep.) at 57:12-19 (police "can't make an edit to try and edit something out of" body worn camera videos).)[1]

---

[1]  Many of the events that transpired on the evening of February 12, 2021 were recorded in undisputed footage from multiple body worn cameras of officers at the scene on February 12, 2021. Footage from these body worn cameras must be credited to the extent it blatantly contradicts contrary evidence. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380-86 (2007) (reversing court of appeals for not "view[ing] the facts in the light depicted by the videotape").

Thus, "video evidence may be credited over a non-movant's account if the video 'blatantly contradicts' that account." *Linton v. Zorn*, 135 F.4th 19, 37

At approximately 10:22 p.m. on February 12, 2021, in the vicinity of 78th Street and 12th Avenue in Brooklyn, New York, Jahmi, Monte, and Beydoun observed Rivera sitting alone in the driver's seat of a double-parked white BMW SUV, with darkly tinted windows and a license plate cover that partially obscured the license plate. (*See* ECF No. 66 ("Defs.' 56.1 Statement of Material Facts" or "SOF") ¶¶ 1-4; ECF No. 70 ("Rivera 56.1 Counterstatement of Material Facts" or "CSOF") ¶¶ 1-4; ECF No. 65-1 (Jahmi Body Worn Camera ("BWC")) at 22:22:21 to 22:23:10;[2] ECF No. 65-14 (Monte BWC) at 22:22:21 to 22:23:12; ECF No. 65-15 (Beydoun BWC) at 22:22:21 to 22:23:12, 22:27:01.)

The BMW was double parked, although it was running with its lights on when police arrived. (SOF ¶ 2; CSOF ¶ 2; ECF No. 68-1 (Rivera Dep.) at 35:6-8; ECF No. 68-2 (Jahmi Dep.) at 12:16-19; ECF No. 68-4 (Beydoun Dep.) at 28:24 to 29:5; ECF No. 65-1 (Jahmi

---

(2d Cir. 2025) (alteration adopted) (quoting *Scott*, 550 U.S. at 380); *see also Pratt v. Nat'l R.R. Passenger Corp.*, 709 F. App'x 33, 34 (2d Cir. 2017) (holding district court "correctly ruled" that "objective video and data evidence . . . was sufficient to overcome all contrary eyewitness testimony and preclude any genuine dispute of material fact"). But where "a reasonable finder of fact could determine at trial that, based upon the video and the remainder of the record," events occurred in a manner urged by the non-movant, summary judgment is not warranted. *Linton*, 135 F.4th at 37-39; *see also Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 482 (N.D.N.Y. 2017) ("*Scott* is best understood to permit the summary adjudication of a plaintiff's civil rights claim only in those exceptional cases where the video evidence in the record is sufficient to 'blatantly contradict' one party's version of events" (alteration adopted) (quoting *Scott*, 550 U.S. at 380)).

[2]    Pinpoint citations to body worn camera footage are to the 24-hour and minute timestamp superimposed on the footage of the events of February 12, 2021.

BWC) at 22:23:10; ECF No. 65-14 (Monte BWC) at 22:23:12; ECF No. 65-15 (Beydoun BWC) at 22:23:12, 22:27:01.)  The street on which the BMW was double parked was lit by streetlights.  (*E.g.*, ECF No. 65-15 (Beydoun BWC) at 22:23:29–35; ECF No. 68-4 (Beydoun Dep.) at 51:10–11 ("It was a dark day[;] it was snowing outside.  It was well-lit.").)  Snowdrifts were visible on the street and sidewalk.  (*E.g.*, ECF No. 65-15 (Beydoun BWC) at 22:23:29–35.)  Residential homes lined both sides of the street.  (*E.g.*, *id.*)

Rivera's white, double-parked BMW is depicted on the left of the below screenshot, citing note 3:



---

3    (ECF No. 65-1 (Jahmi BWC) at 22:23:13.)

A license plate cover partially obscured the BMW's plate as shown in the center of the below screenshot, citing note 4:



(SOF ¶ 4; CSOF ¶ 4 ("Admit[ting] there was a cover, but disput[ing] that the license plate was obstructed."); ECF No. 65-15 (Beydoun BWC) at 22:27:01; ECF No. 65-4 (Photos of BMW) at 2–5 (CM/ECF numbering).)  The BMW's windows appeared to the Defendants to be tinted in excess of the legal limit of 30 percent.[5]

At approximately 10:23 p.m., Jahmi, Monte, and Beydoun, who were in uniform, after observing that the BMW was in violation of three provisions of New York Vehicle and Traffic Law, approached

---

[4]    (ECF No. 65-4 (Photos of BMW) at 5 (CM/ECF numbering).)

[5]    *See* N.Y. Veh. & Traf. Law § 375(12-a)(b)(1).  Rivera disputes that the BMW had excessive window tints.  (*See* SOF ¶ 3; CSOF ¶ 3.)  Although Jahmi, Monte, and Beydoun testified that the BMW had illegally tinted windows, (ECF No. 68-2 (Jahmi Dep.) at 12:7-15; ECF No. 68-4 (Beydoun Dep.) at 30:15 to 31:5; ECF No. 68-6 (Monte Dep.) at 9:10 to 10:9), Rivera testified that the BMW windows "have factory tint."  (ECF No. 68-1 (Rivera Dep.) at 31:17-21.)  The Court finds, however, that undisputed evidence establishes that the window tints exceeded legal limits.  (*See* ECF No. 65-12 (Criminal Complaint) at 3 (CM/ECF numbering) (stating that "Officer Sean Christian . . . tested the [BMW]'s windows with a Laserlab [*sic*] 1000 Enforcer II, and the results of said light transmittance indicated a fifteen (15) percent intake"); ECF No. 65-3 (Arrest Report) at 2 (CM/ECF numbering) (noting "excessive window tint").)

the BMW and "immediately" smelled the odor of marijuana emanating from the vehicle, though Rivera denies that he was smoking. (SOF ¶ 5; CSOF ¶ 5; ECF No. 68-2 (Jahmi Dep.) at 15:8 to 19:25; ECF No. 68-4 (Beydoun Dep.) at 36:6 to 39:15; ECF No. 68-6 (Monte Dep.) at 11:12-22; ECF No. 65-1 (Jahmi BWC) at 22:23:08-15; ECF No. 65-14 (Monte BWC) at 22:23:08-15; ECF No. 65-15 (Beydoun BWC) at 22:23:08-15.)[6] The officers shined their flashlights into the vehicle to ensure Rivera was alone and that he was not in possession of a weapon that could harm the officers. (*See* ECF No. 65-1 (Jahmi BWC) at 22:23:15-23; ECF No. 65-14 (Monte BWC) at 22:23:15-23; ECF No. 65-15 (Beydoun BWC) at 22:23:15-23; *see also* ECF No. 68-2 (Jahmi Dep.) at 23:7-12 (noting purpose of shining flashlights into the vehicle "is to make sure there's no weapon in the immediate grabbing area").)

As shown in the following two screenshots, officers simultaneously approached both sides of Rivera's double-parked BMW, with Monte approaching the passenger's side (screenshot

---

[6] Possession of marijuana was illegal in New York on February 12, 2021. *See* N.Y. Penal Law § 222.05(1) (legalizing certain personal use of marijuana as of March 31, 2021)); *Amigon v. Luzon*, No. 21-cv-2029(PMH), 2025 WL 1952581, at *5 n.9 (S.D.N.Y. July 16, 2025) ("New York's legalization of personal-use marijuana [] became effective on March 31, 2021, and as the law does not apply retroactively, such legislation has no effect on the validity of the search here[.]" (citations omitted)); *accord United States v. Burt*, No. 23-6020, 2024 WL 3244380, at *2 & n.1 (2d Cir. 2024) ("smell of marijuana created reasonable suspicion to extend the traffic stop" because stop occurred before March 31, 2021 (citing *United States v. Jenkins*, 452 F.3d 207, 214 (2d Cir. 2006))).

citing note 7) and Jahmi approaching the driver's side (screenshot citing note 8):





At approximately 10:23:19 p.m., Jahmi, standing just outside the driver's window of the double-parked BMW, asked Rivera for his

---

7    (ECF No. 65-15 (Beydoun BWC) at 22:23:15.)

8    (ECF No. 65-15 (Beydoun BWC) at 22:23:35.)

identification and to roll down the vehicle's windows.  (ECF No. 65-1 (Jahmi BWC) at 22:23:17–21.)  Rivera rolled down the windows, but instead of his driver's license, he handed Jahmi a credit card. (*Id.* at 22:23:22–32; 22:23:44–50.)  Subsequently, Rivera produced his driver's license.  (*Id.* at 22:23:33–36.)

The following screenshot, citing note 9, shows Rivera, while remaining seated in the BMW's driver's seat, returning his driver's license to his wallet after it had been inspected by Jahmi:



Jahmi asked if Rivera had been arrested before, to which Rivera responded, "Yes."  (*Id.* at 22:23:36–38.)  Jahmi asked Rivera what he was waiting for, to which Rivera responded he was "waiting for [his] girlfriend."  (*Id.* at 22:23:46–51.)  Rivera asked if he should unlock the doors of the BMW, to which Jahmi responded, "Not

---

9      (ECF No. 65-1 (Jahmi BWC) at 22:23:51.)

yet." (*Id.* at 22:23:53–58.) After Rivera stated that his last arrest had been for drinking and driving, officers asked whether Rivera had been drinking that night, to which Rivera responded, "No, not at all." (*Id.* at 22:24:00–13.)

At approximately 10:24 p.m., Rivera exited the BMW at Jahmi's request, as shown in the following screenshot, citing note 10. (SOF ¶¶ 6-7; CSOF ¶¶ 6-7; ECF No. 65-1 (Jahmi BWC) at 22:24:23; ECF No. 65-14 (Monte BWC) at 22:24:23; ECF No. 65-15 (Beydoun BWC) at 22:24:23.)



Jahmi asked whether Rivera "had anything on [him]," to which Rivera responded, "No." (ECF No. 65-1 (Jahmi BWC) at 22:24:23-25.) Jahmi said he would "check [Rivera] real quick," before

---

[10]    (ECF No. 65-15 (Beydoun BWC) at 22:24:23.)

beginning a pat-down search of Rivera's person and outer pockets. (*Id.* at 22:24:26-30.)

> **b.    Rivera Flees and Throws a Bag of Illegal Drugs That Non-Party Officer Djonbalaj Subsequently Discovers**

At approximately 10:24:28 p.m., after having observed several traffic violations and smelling the odor of marijuana emanating from Rivera's BMW, Jahmi began to pat down Rivera's person. (ECF No. 65-1 (Jahmi BWC) at 22:24:28.)  But approximately ten seconds later, at 10:24:38 p.m., after Jahmi had completed the pat down of the front-left pocket of Rivera's pants and as Jahmi proceeded toward the right side of Rivera's jacket, Rivera suddenly pushed away and began running down the sidewalk away from Jahmi, Monte, and Beydoun. (SOF ¶¶ 7-8; CSOF ¶¶ 7-8; ECF No. 65-15 (Beydoun BWC) at 22:24:35-38; ECF No. 65-1 (Jahmi BWC) at 22:24:28-38.)[11] Jahmi and Beydoun chased after Rivera. (*See* ECF No. 65-1 (Jahmi BWC) at 22:24:38-47; ECF No. 65-15 (Beydoun BWC) at 22:24:38-47.)

The following two screenshots, citing notes 12 and 13, are excerpted from undisputed body worn camera footage and show the first few seconds of Rivera pushing away from Jahmi and fleeing

---

[11]    Rivera contends that he "did not push Defendant Jahmi" but admits that he "r[a]n away" during the search, claiming to have been frightened. (*See* CSOF ¶ 8.)  The Court finds based on undisputed video evidence that Rivera pushed past Jahmi to begin his flight. (*See, e.g.*, ECF No. 65-15 (Beydoun BWC) at 22:24:35-38.)

from the officers, from approximately 10:24:38 p.m. to 10:24:40 p.m.:





Less than ten seconds from the beginning of Rivera's flight, at approximately 10:24:45 p.m., the video shows Rivera, while

---

[12]    (ECF No. 65-15 (Beydoun BWC) at 22:24:38.)

[13]    (ECF No. 65-1 (Jahmi BWC) at 22:24:40.)

running, reaching into his pocket with his right hand, removing a plastic bag, and throwing the bag to his right; the bag landed near the left rear side of a light colored sedan parked along the path of Rivera's flight, as Rivera ran rapidly toward and by the light colored sedan.  (SOF ¶¶ 9–10; CSOF ¶¶ 9–10; ECF No. 65-9 (Annotated Screenshots Excerpted from Jahmi BWC) at 6–15 (CM/ECF numbering); ECF No. 65-1 (Jahmi BWC) at 22:24:38 to 22:24:45.)

The following two screenshots, citing notes 14 and 15, show Rivera throwing the bag while fleeing police on foot and the bag landing near the left rear side of a parked light colored sedan. In each of the below screenshots, the bag appears within a superimposed rectangle.



---



Non-party NYPD Officer Burim Djonbalaj arrived at the scene at approximately 10:29:14 p.m. in response to a call for back-up. (ECF No. 65-13 (Djonbalaj BWC) at 22:29:14.) Djonbalaj immediately began canvassing the area near Rivera's path of flight and, at approximately 10:29:59 p.m., Djonbalaj located and recovered the bag thrown by Rivera and alerted other law enforcement present at the scene, including Beydoun, who physically picked up the bag that Rivera had thrown and Djonbalaj had located. (SOF ¶¶ 11–12; CSOF ¶¶ 11–12; ECF No. 65-13 (Djonbalaj BWC) at 22:29:21 to 22:30:03; ECF No. 65-15 (Beydoun BWC) at 22:30:03 to 22:30:15.)

---

[15]    (ECF No. 65-9 at 14; *see also* ECF No. 65-1 (Jahmi BWC) at 22:24:45.)

The following screenshot, citing note 16, shows the bag as depicted on Djonbalaj's body worn camera moments before it was recovered.   A superimposed rectangle circumscribes the bag.



The following two screenshots show officers holding the recovered bag, and depict interior bags or vials within the recovered bag.   Beydoun holds the bag in the first screenshot below, citing note 17, and Jahmi holds the bag in the second screenshot below, citing note 18.



---

[16]    (ECF No. 65-13 (Djonbalaj BWC) at 22:29:59 (emphasis added).)

[17]    (ECF No. 65-14 (Monte BWC) at 22:30:16.)

14



Beydoun and Jahmi later determined, based on their training and experience, that the recovered bag appeared to contain "approximately twenty-five (25) grams of crack cocaine, approximately seven (7) grams of crystal meth, approximately nine (9) grams of heroin, approximately twenty-eight (28) oxycodone pills, approximately twenty eight (28) Adderall pills, and THC gummies."  (ECF No. 65-12 (Criminal Complaint) at 3 (CM/ECF numbering); *see also* ECF No. 65-3 (Arrest Report).)  On February 13, 2021, Jahmi vouchered the bag's contents, and non-party Sergeant John Freisen approved Jahmi's voucher report.  (*See* ECF No. 65-11 (Voucher Report).)[19]

---

[18]    (ECF No. 65-1 (Jahmi BWC) at 22:31:20.)

[19]    In addition to the bag of controlled substances thrown by Rivera and recovered by Djonbalaj, Jahmi separately recovered from Rivera ten pills of "vilitra," fifteen pills of "tadalafil," and sixteen pills of "sildenafil," which were later vouchered by the NYPD.  (ECF No. 65-10 at 2 (CM/ECF numbering); SOF ¶¶ 15-16; CSOF ¶¶ 15-16.)  Rivera does not dispute that he possessed the

Rivera disputes that he threw a bag containing controlled substances that was located and recovered by the NYPD. (*See* ECF No. 69 at 8–14; CSOF ¶ 9; ECF No. 68-1 (Rivera Dep.) at 45:2–7.) For reasons addressed below, *see infra* Discussion Section II, the Court finds that there is no genuine dispute as to whether Rivera threw a bag containing controlled substances that was located and recovered by the NYPD.

### 2. Events Occurring at the 68th NYPD Precinct

#### a. The Debriefing

Following Rivera's arrest on the evening of February 12, 2021, (SOF ¶ 17; CSOF ¶ 17), officers returned with Rivera to the 68th NYPD Precinct, uploaded their body worn camera footage to NYPD systems, reviewed Jahmi's body worn camera footage, and, by slowing the footage, saw that Rivera had thrown a bag as he was running from the officers. (ECF No. 68-4 (Beydoun Dep.) at 52:6 to 53:16, 56:14-22 (noting that Beydoun saw "an object leave[] [Rivera's] right hand" when watching Jahmi's body camera video footage at "0.5 speed"); ECF No. 68-2 (Jahmi Dep.) at 69:6–21 (Jahmi examined his body camera video footage "[r]ight after the arrest," "[o]nce [he] had gotten back to the precinct").) The body worn camera footage cannot be altered, and Rivera does not claim or even suggest that it was. (*See* ECF No. 69 at 5 (noting "the Parties do

---

vilitra, tadalafil, or sildenafil that Jahmi recovered and vouchered.

not dispute the accuracy of any of the videos"); *see also* ECF No. 68-4 (Beydoun Dep.) at 57:12–19 (police "can't make an edit to try and edit something out of" body worn camera videos).)

After processing, Rivera was brought by Jahmi to a debriefing room located in the 68th NYPD Precinct where "about six" officers were present, including Jahmi, Monte, and Beydoun. (CSOF ¶ 17; ECF No. 72 ("Defs.' 56.1 Reply" or "RCS") ¶ 17; ECF No. 68-1 (Rivera Dep.) at 69:2 to 70:4.)[20] There was no recording device in the debriefing room. (CSOF ¶ 17; RCS ¶ 17; ECF No. 68-5 (Beydoun Dep.) at 108:10–15.)

Beydoun testified that, in his capacity as "field intelligence sergeant," he and other officers debriefed Rivera on

---

[20] Defendants do not specifically deny any of the statements of material fact set forth at paragraph 17 of Rivera's 56.1 Counterstatement of Material Facts. Instead, Defendants "admit that plaintiff claims" certain facts, including that Beydoun solicited a bribe when he asked Rivera to work with the police, and argue that the statements "are not material" to Rivera's claims. (*See* RCS ¶ 17.) Defendants' response could be construed as an admission if paragraph 17 of Rivera's 56.1 Counterstatement of Material Facts were supported by evidence in the record, which it is not. *See, e.g.*, *Cui v. FBI*, 551 F. Supp. 3d 4, 15 (E.D.N.Y. 2021) (deeming facts in movant's 56.1 statement as "admitted where supported by the record" where the non-movant "incorporate[d]" the movant's statements of undisputed facts (citing *Est. of Keenan v. Hoffman-Rosenfeld*, 833 F. App'x 489, 491 (2d Cir. 2020))); *Ball v. Marriott Int'l, Inc.*, 627 F. Supp. 3d 296, 308 n.2 (S.D.N.Y. 2022) (considering "facts to be admitted" where non-movant "dispute[d]" facts but failed to cite admissible record evidence). In any event, the Court finds that the alleged statements by Beydoun during Rivera's debriefing do not undermine the existence of evidence establishing probable cause for Rivera's February 12, 2021 arrest and do not establish fabrication of evidence. Beydoun testified that he asked Rivera to "work with" the police to provide a proffer to obtain intelligence, and that if Rivera did so, the police could seek a reduced sentence. (*See* ECF No. 68-5 (Beydoun Dep.) at 101:4–13.) Thus, for reasons addressed below, *see infra* Discussion Sections II-III, Rivera's testimony as to what occurred in the debriefing room is immaterial to his § 1983 claims because it does not establish fabrication or malicious abuse of process.

February 12, 2021 to gather intelligence and to ask Rivera to work with them as an informant. (ECF No. 68-5 (Beydoun Dep.) at 99:13 to 104:5.) Specifically, Beydoun testified that the purpose of Rivera's debriefing was to obtain information concerning illegal activities involving narcotics or firearms that could lead to a search warrant. (*See* ECF No. 68-5 (Beydoun Dep.) at 101:4–13, 102:5–13.) Jahmi and Monte provided deposition testimony that accords with Beydoun's testimony as to what occurred during the February 12, 2021 debriefing. (*See* ECF No. 68-3 (Jahmi Dep.) at 94:17–24 ("I don't remember exactly what was asked of him. Generally, along the lines of if he knew of any crimes that were occurring."); ECF No. 68-6 (Monte Dep.) at 42:17 to 43:7 (testifying that he did not remember whether Rivera was debriefed but that it would be "standard procedure" for Beydoun and Jahmi to debrief a defendant, including Rivera, following his arrest).)

"At some point" prior to the debriefing, Beydoun realized that he "had encounters" with Rivera in the past. (ECF No. 68-5 (Beydoun Dep.) at 101:4–19.)[21] During the debriefing, Beydoun

---

[21] Beydoun had encountered Rivera on July 8, 2019, when Rivera was arrested for and charged with, according to his deposition testimony, "cash and drugs." (ECF No. 68-1 (Rivera Dep.) at 105:14 to 106:11.) Beydoun approved the vouchering of Rivera's personal items, including cash in the amount of $100,441, in connection with Rivera's July 8, 2019 arrest. (CSOF ¶ 17; RCS ¶ 17; ECF No. 68-1 (Rivera Dep.) at 101:6 to 107:9; ECF No. 71-12 (Rivera Decl.) ¶¶ 2–4; ECF No. 71-13 (NYPD voucher dated July 8, 2019 approved by Beydoun vouchering $100,441 in cash seized from Rivera).) According to Rivera's deposition testimony, on an unspecified second date, Beydoun and others had searched Rivera's vehicle and "arrested and charged [Rivera] with brass knuckles." (ECF

18

"briefly mentioned" to Rivera one of these prior interactions "involving narcotics," and Rivera "stayed quiet, or he said I don't know." (ECF No. 68-5 (Beydoun Dep.) at 103:16-24.)

Beydoun testified that a report generated after Rivera's February 12, 2021 debriefing reflected that it was a "negative briefing," which indicated that the subject [i.e., Rivera,] gave officers "nothing" during the debriefing. (ECF No. 68-5 (Beydoun Dep.) at 102:17 to 103:3.)

Rivera, in some contrast to Beydoun, Jahmi, and Monte, testified that Beydoun, during the February 12, 2021 debriefing, requested that Rivera "give the officers a bribe in exchange for" being "let go with minor criminal charges"; Rivera further testified that Beydoun told him that if Rivera "did not cooperate," he "would be charged with possession of drugs which Defendant Beydoun knew did not belong to Plaintiff." (CSOF ¶ 17; RCS ¶ 17; ECF No. 68-1 (Rivera Dep.) at 70:14-25, 73:4-20.)

Rivera testified that he "indicated he would not cooperate," and that Beydoun again "pressed [Rivera] to provide a bribe." (CSOF ¶ 17; RCS ¶ 17; ECF No. 68-1 (Rivera Dep.) at 71:7-11.) Rivera testified that after he again refused to provide a bribe, he was taken by Jahmi to the 68th NYPD Precinct's central booking

No. 68-1 (Rivera Dep.) at 101:25 to 104:23.) The additional encounters are immaterial, and the Court need not consider them further.

room.  (CSOF ¶ 19; RCS ¶ 19; ECF No. 68-1 (Rivera Dep.) at 76:19-24.)

### b.    The BMW Searches

After Rivera's BMW was driven by Jahmi to the 68th NYPD Precinct, Jahmi participated in a standard inventory search of the vehicle, which was not captured on video footage.  (ECF No. 68-2 (Jahmi Dep.) at 33:23-25, 35:11-20 (noting precinct vehicle inventory search was not recorded on body cam or surveillance video); *see also* ECF No. 68-5 (Beydoun Dep.) at 111:18 to 113:10 (Beydoun testifying that inventory searches are standard and generally required).)[22]  The search of Rivera's vehicle revealed a hidden compartment that had to be opened with force.  (ECF No. 68-3 (Jahmi Dep.) at 100:22 to 102:24; *see also* ECF No. 68-5 (Beydoun Dep.) at 112:18 to 113:10.)

Beydoun testified that he "reached out to a specialist" to inquire about the "hidden compartment" in Rivera's vehicle and confirmed that the compartment was "an aftermarket modification," and a "poorly modified" "trap."  (ECF No. 68-4 (Beydoun Dep.) at

---

[22]    The BMW had also been briefly searched on February 12, 2021 in the vicinity of 78th Street and 12th Avenue.  Specifically, from approximately 10:27 p.m. to 10:29 p.m. on February 12, 2021, Beydoun and Jahmi briefly searched the BMW. (ECF No. 65-15 (Beydoun BWC) at 22:27:00 to 22:28:53; ECF No. 65-1 (Jahmi BWC) at 22:28-53; *see also* ECF No. 68-4 (Beydoun Dep.) at 65:16-21, 88:1-10; ECF No. 68-2 (Jahmi Dep.) at 34:1-3.)  From approximately 10:32 p.m. to 10:40 p.m. on February 12, 2021, Jahmi then drove the BMW from the vicinity of 78th Street and 12th Avenue to the 68th NYPD Precinct, where it was inventoried.  (ECF No. 65-1 (Jahmi BWC) at 22:32:21 to 22:39:49; *see also* ECF No. 68-2 (Jahmi Dep.) at 33:23-25 ("I drove it back to the precinct.").)

67:2-21.)   Beydoun  and  Jahmi  both  testified  that  the  hidden
compartment was empty and contained no contraband.  (ECF No. 68-4
(Beydoun Dep.) at 67:22-24; ECF No. 68-3 (Jahmi Dep.) at 101:9-
11.)

Rivera testified that his BMW was "completely damaged" "as a
result  of  the  police,"  based  on  the  difference  between  the
condition  of  the  BMW  before  he  was  detained  and  the  condition  in
which it was returned to him after it had been in police custody.
(*See* CSOF ¶ 17; RCS ¶ 17; ECF No. 68-1 (Rivera Dep.) at 85:21-23.)
Specifically,  before  the  BMW  was  seized  and  searched,  Rivera
testified  that  "it  was  a  brand-new  car."   (ECF  No.  68-1  (Rivera
Dep.) at 86:15-17.)  Photos show that after the BMW was returned
to Rivera following the dismissal of his underlying criminal case
in December 2021, (ECF No. 68-1 (Rivera Dep.) at 82:9-16), the
vehicle's interior had been taken apart, principally by the removal
of paneling on the right and left sides of the vehicle's dashboard
and by abrasions to the car's interior surfaces.  (CSOF ¶ 17; RCS
¶ 17; ECF No. 68-1 (Rivera Dep.) at 90:8-23; ECF No. 71-11 at 14-
34 (CM/ECF numbering).)

**B.   State Criminal Proceedings**

On February 13, 2021, Rivera was charged by criminal complaint
with nineteen counts: (1-3) three counts of criminal possession of
a  controlled  substance  in  the  third  degree;  (4-5)  two  counts  of
criminal possession of a controlled substance in the fifth degree;

21

(6–14) nine counts of criminal possession of a controlled substance in the seventh degree; (15) one count of obstructing governmental administration in the second degree; (16) one count of stopping, standing, or parking prohibited in specific places; (17) one count of improper coating on side windows; (18) one count of improper coating on rear window; and (19) one count of improper display of plates. (SOF ¶ 18; CSOF ¶ 18; ECF No. 65-12 (Criminal Complaint).) Also on February 13, 2021, Rivera appeared virtually in criminal court, was arraigned on the criminal complaint, and was released on his own recognizance. (SOF ¶ 19; RCS ¶ 19; ECF No. 68-1 (Rivera Dep.) at 77:4-25.)

On December 15, 2021, all charges brought against Rivera in state court were dismissed. (CSOF ¶ 19; RCS ¶ 19; ECF No. 68-1 (Rivera Dep.) at 81:18 to 82:4; ECF No. 71-14 (Certificate of December 15, 2021 Disposition dated November 8, 2023)).

## II.  PROCEDURAL HISTORY

Rivera commenced this action on April 19, 2022, (ECF No. 1 (Complaint)), and filed an amended complaint on April 21, 2023, (ECF No. 26 ("Amended Complaint" or "AC")).  After the parties' stipulation to dismiss two claims in the AC (*see* ECF No. 48), the following seven claims remain pending:

- (1) denial of fair trial based on fabrication of evidence against Beydoun in violation of 42 U.S.C. § 1983 (AC ¶¶ 56-63) ("Count One");

- (2) failure to intervene against Jahmi and Monte in violation of § 1983 (AC ¶¶ 64-71) ("Count Two");

- (3) malicious abuse of process against Beydoun in violation of § 1983 (AC ¶¶ 72-79) ("Count Three");

- (4) abuse of process against Beydoun in violation of New York common law (AC ¶¶ 97[23]-103) ("Count Four");

- (5) negligence against Beydoun and the City of New York in violation of New York common law (AC ¶¶ 105[24]-110) ("Count Five");

- (6) negligent hiring, training, and supervision against the City of New York in violation of New York common law (AC ¶¶ 111-117) ("Count Six"); and

- (7) *respondeat superior* liability against the City of New York in violation of New York common law (AC ¶¶ 118-124) ("Count Seven").

On January 28, 2025, following the close of discovery, the parties filed their moving papers in connection with Defendants' motion for summary judgment.  (ECF Nos. 64-74.)

## LEGAL STANDARDS

### I. SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Alberty v. Hunter*, 144 F.4th 408, 414 (2d Cir. 2025).  A court

---

[23]    Two counts enumerated at paragraphs 80-96 of the AC were dismissed by stipulation.  (*See* ECF No. 48.)

[24]    The Amended Complaint contains no paragraph 104.  (*See* ECF No. 26 at 19.)

should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphasis retained). "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,'" and "[a] fact is material if it 'might affect the outcome of the suit under the governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of" the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has fulfilled its preliminary burden, "the nonmoving party must come forward with evidence that would be sufficient to support a jury verdict in its favor." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (internal quotation marks and citation omitted). "Thus,

24

rather than merely deny the moving party's allegations in a general way, the party opposing summary judgment must present competent evidence that creates a genuine issue of material fact." *Id.* (internal quotation marks and citations omitted).

"In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322–23); *accord El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016) ("there can be 'no genuine issue as to any material fact'" when a "party [that] will bear the burden of proof at trial" "fails to make a showing sufficient to establish the existence of an element essential to that party's case" (citations omitted)).

"The role of the district court on summary judgment is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *McKinney*, 49 F.4th at 738 (internal quotation marks and citation omitted).

## II.  SECTION 1983 CLAIMS

Several of Rivera's claims are brought pursuant to 42 U.S.C. § 1983.  Under § 1983,

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes

> to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983. "Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012). Section 1983 "does not confer any substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Village of Freeport v. Barrella*, 814 F.3d 594, 600 n.8 (2d Cir. 2016) (internal quotation marks and citation omitted).

A § 1983 claimant must establish two elements: "(1) the challenged conduct was attributable at least in part to a person acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Flynn v. James*, 513 F. App'x 37, 39 (2d Cir. 2013) (quoting *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999)).

## III. QUALIFIED IMMUNITY

"Qualified immunity is an affirmative defense available to a person defending a suit brought under 42 U.S.C. § 1983." *Linton v. Zorn*, 135 F.4th 19, 30 (2d Cir. 2025). Qualified immunity "shields public officials, including law enforcement officers, 'from liability for civil damages under that statute insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'" *Id.* (alteration adopted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, 'taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right.'" *Tolan v. Cotton*, 572 U.S. 650, 655-66 (2014) (per curiam) (alterations adopted) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "The second prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation." *Id.* at 656 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Unless the state of the law at the time of the allegedly wrongful conduct was such that it provided "fair warning" to the defendants that their conduct was unconstitutional, civil damages are unavailable. *See id.* (citing *Hope*, 536 U.S. at 739, 741); *accord Linton*, 135 F.4th at 31 ("In general, 'qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.'" (alteration adopted) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009))).

## IV. PROBABLE CAUSE

To assess the existence of probable cause to arrest, prosecute, or seize evidence for a potential prosecution and trial,

courts look to the facts known by the arresting officer at the time of the arrest. *See Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006)). This standard is a "practical" one that analyzes the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). "An officer's assessment in this regard need not be perfect because 'the Fourth Amendment allows for some mistakes on the part of government officials,'" *United States v. Diaz*, 854 F.3d 197, 203 (2d Cir. 2017) (quoting *Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014)) (citing *Herring v. United States*, 555 U.S. 135, 139 (2009)), and may be based on the collective knowledge of officers involved in an investigation so long as the officers were in communication with each other. *See United States v. Cruz*, 834 F.2d 47, 51 (2d Cir. 1987) (citation omitted).

The probable cause standard is fluid and contextual, so a court must examine the totality of the circumstances of a given arrest or police action from the perspective of a reasonable police officer in light of his or her training and experience. *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008) (citations omitted); *see also Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) ("probable cause is 'a fluid concept not readily, or even usefully,

reduced to a neat set of logical rules.'" (alteration adopted) (citation omitted) (quoting *Gates*, 462 U.S. at 232)).

**DISCUSSION**

## I.  JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a) and 1367(a).

## II.  SECTION 1983: FAIR TRIAL CLAIM AGAINST BEYDOUN (COUNT ONE)

For the reasons set forth below, Defendants' motion for summary judgment on Rivera's fair trial claim is granted.

"To succeed on a fair trial claim based on fabricated evidence, 'a plaintiff must establish that an (1) investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result.'" *Ferguson v. City of N.Y.*, No. 23-1315, 2025 WL 1793890, at *3 (2d Cir. June 30, 2025) (quoting *Barnes v. City of N.Y.*, 68 F.4th 123, 128 (2d Cir. 2023)); *accord Galloway v. County of Nassau*, 141 F.4th 417, 426 (2d Cir. 2025) ("a police officer violates a defendant's right to a fair trial when he 'creates false information likely to influence a jury's decision and forwards that information to prosecutors'" (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997))). "[A] Section 1983 fair trial claim is available [] even if the underlying criminal charges are dismissed and the fabricated

evidence is never presented at trial" and "can stand even if the officer had probable cause to arrest the Section 1983 plaintiff[.]" *Kee v. City of N.Y.*, 12 F.4th 150, 168–69 (2d Cir. 2021) (citations omitted); *accord Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 248 (2d Cir. 2020) ("probable cause is not a defense to a fair trial claim based on the fabrication of evidence").

In the context of fair trial claims based on a theory that a law enforcement officer fabricated contraband, an officer's reasonable belief that a plaintiff possessed contraband is, on its own, insufficient to warrant summary judgment on the plaintiff's claim for fabrication of evidence. *See Kee*, 12 F.4th at 155, 167, 170–71 (finding district court erred in granting summary judgment on plaintiff's fair trial claim, even where defendant detective "assert[ed] he saw" plaintiff using a controlled substance, because plaintiff had offered testimony that he did not use the controlled substance and district court should have "assume[d] that the jury w[ould] credit plaintiff's version of events"); *Vega-Colon v. Eulizier*, No. 23-1211, 2024 WL 3320433, at *5 (2d Cir. July 8, 2024) ("we have repeatedly held that 'disputed issues regarding the reasonableness of an officer's perception of the facts (whether mistaken or not) [*sic*] [are] the province of the jury . . .'" (quoting *Jones v. Treubig*, 963 F.3d 214, 231 (2d Cir. 2020)); *Ortiz v. Stambach*, 137 F.4th 48, 58, 62, 67–69 (2d Cir. 2025) (district court properly submitted fabrication of evidence

claim to jury where "jury could rationally conclude from circumstantial evidence in the record that [defendant detective], in bad faith, fabricated [plaintiff's] confession," even where the detective testified plaintiff confessed and plaintiff was unable "to testify to what took place in his time" with the detective).

The burden of proof to show deliberate fabrication is on the plaintiff. *See, e.g.*, *Davis-Guider v. City of Troy*, No. 23-589, 2024 WL 5199294, *3 (2d Cir. Dec. 23, 2024) ("The second element of a fair trial claim based on fabricated evidence requires a plaintiff to prove that a defendant's use of inaccurate information was 'knowing, as opposed to mistaken.'" (quoting *Barnes*, 68 F.4th at 129) (citing *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016))); *see also Lauderdale v. City of N.Y.*, No. 15-cv-1486(JGK), 2018 WL 1413066, *8-9 (S.D.N.Y. Mar. 19, 2018) (granting motion for summary judgment where "all that the plaintiff has adduced, construing the evidence in the plaintiff's favor, is that the officers were mistaken in identifying him as the person involved in the drug sale" and there was "no evidence that the defendants deliberately misidentified the plaintiff and thereby fabricated a false identification").

Here, the only element disputed by the parties is whether Beydoun deliberately fabricated information. (*See* ECF No. 67 at 4-11; ECF No. 69 at 8-14.) For the reasons set forth below, Defendants have established, based on undisputed evidence in the

record, that there is no genuine dispute of material fact, and that Beydoun did not fabricate information.  Thus, Rivera cannot show the second element of his fair trial claim based on fabrication, and Defendants' motion for summary judgment on Rivera's fair trial claim is therefore granted.

**A.  There Is No Genuine Dispute that Rivera Threw a Bag Containing Controlled Substances That Was Located and Retrieved by the NYPD**

Rivera disputes that (1) he threw a bag while fleeing police, (2) the bag he threw is the same one that was recovered from the light colored sedan parked along the path of Rivera's flight, and (3) the recovered bag contained controlled substances.  (*See* ECF No. 69 at 8-14.)  For the following reasons, the Court concludes that undisputed record evidence -- including extensive, unbroken, and undisputed video footage from the body worn cameras of officers present at the scene -- shows that Rivera did throw a bag while fleeing police, the bag he threw in the direction of a light colored sedan parked along the path of his flight is the same bag later recovered by police near the sedan, and the recovered bag contained controlled substances.

**1.  Rivera Threw a Bag While Fleeing Police**

First, contrary to Rivera's contention that expert testimony is required to understand what is shown by the annotated screenshots excerpted from Jahmi's body worn camera (CSOF ¶ 9), the Court may review submitted video evidence on a motion for

summary judgment without the aid of expert testimony. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007); *see also Linton*, 135 F.4th at 37 (relying on court's review of video in determining appeal from motion granting summary judgment).

Second, Rivera's citation to his own deposition testimony that he did not throw anything, and citation to the deposition testimony of Beydoun and Jahmi that they did not see Rivera throw anything at the time they were pursuing Rivera, does not create a genuine factual dispute.

Beydoun and Jahmi testified that they did not see Rivera throw anything at the time they were pursuing Rivera on foot because they were both focused on the pursuit. (ECF No. 68-2 (Jahmi Dep.) at 48:15 to 49:7 (Jahmi testified that he had "tunnel vision" while chasing Rivera because his "main objective was not to get hurt, the safety of [him]self and all of the civilians and all of [his] fellow officers," and because Jahmi had "not resolved" whether Rivera had a weapon "because [Jahmi] hadn't completed the search of [Rivera's] pocket[s]"); ECF No. 68-4 (Beydoun Dep.) at 45:18 to 47:4 (Beydoun testified that he had a partially "obstruct[ed]" view of Rivera during the chase, in part because, during Rivera's flight, Jahmi was between one and three feet behind Rivera, and Beydoun was about four feet behind Jahmi).)

Beydoun and Jahmi testified that, after they arrived back at the precinct, they uploaded and then reviewed, at a slowed speed,

body worn camera footage, which showed Rivera throwing a bag away while running away from them. (*See* ECF No. 68-2 (Jahmi Dep.) at 28:3-8, 77:6-10, 78:24 to 79:7; ECF No. 68-4 (Beydoun Dep.) at 80:10-19.)

The following two screenshots, citing notes 25 and 26, excerpted from body worn camera footage, unmistakably depict Rivera throwing a bag while attempting to flee. The bag thrown by Rivera is enclosed by a superimposed rectangle in each screenshot.

The first screenshot shows Rivera's arm as the bag is thrown:



---

25    (ECF No. 65-9 at 8; *see also* ECF No. 65-1 (Jahmi BWC) at 22:24:45.)

The second screenshot shows the bag thrown by Rivera as it lands near the left rear side of a vehicle parked next to Rivera's flight path:



Viewing the facts, as the Court must, "in the light depicted by the videotape," the Court finds that Rivera did throw a bag away from his person while running from Jahmi and Beydoun. *Scott*, 550 U.S. at 381; (ECF No. 65-1 (Jahmi BWC) at 22:24:42 to 22:24:45; ECF No. 65-9 at 6-15 (CM/ECF numbering).)

## 2.    The Bag that Rivera Threw Is the Same One Discovered by Non-Party Officer Djonbalaj

Based on undisputed video evidence showing Rivera throwing the bag as he fled, and showing the retrieval of the bag by law enforcement officers, the Court finds that the bag thrown by Rivera is the same bag discovered and retrieved by Djonbalaj. (*See* ECF

---

[26]    (ECF No. 65-9 at 14; *see also* ECF No. 65-1 (Jahmi BWC) at 22:24:45.)

No. 68-2 (Jahmi Dep.) at 78:24 to 79:11 (testimony that the "object being thrown" is "one and the same" with the object recovered from near the light colored sedan); ECF No. 65-1 (Jahmi BWC) at 22:24:45, 22:31:05; ECF No. 65-13 (Djonbalaj BWC) at 22:30:16; ECF No. 65-14 (Monte BWC) at 22:30:16; ECF No. 65-15 (Beydoun BWC) at 22:30:01 to 22:30:17.)[27]

Specifically, undisputed body worn camera footage shows Rivera, as he fled from Jahmi, throwing a bag that landed near the left rear side of the light colored sedan parked along the path of Rivera's flight; the body worn camera footage from the officers shows that none of the officers, including Beydoun, stopped at the light colored sedan until Officer Djonbalaj arrived, began to

---

[27]    Rivera contends that the bag discovered by Djonbalaj could not be the same bag he threw because the recovered "bag is substantially larger than the object which allegedly came from Plaintiff" and because "Defendants offer no expert testimony nor any evidence which conclusively demonstrates that the two items are the same item." (ECF No. 69 at 9.) The apparent size of an object changing in proportion to its distance from the point at which it is captured by the body worn camera fails to create a genuine issue of material fact regarding any apparent discrepancy in the size of the recovered bag and the size of the bag as it was being thrown by Rivera. Moreover, as noted above, expert testimony is unnecessary to evaluate the significance of video evidence. *See supra* Discussion Section II.A.1.

    Rivera also suggests that the light colored sedan "is not along Plaintiff's path and that the light colored sedan is at least a few feet in front of Plaintiff at the time he was tackled by [] Jahmi." (CSOF ¶¶ 10-11.) First, Rivera threw the bag *before* he was tackled by Jahmi, not "at the time he was tackled." (CSOF ¶ 10; *see* ECF No. 65-1 (Jahmi BWC) at 22:24:42-45.) Moreover, regardless of whether the light colored sedan was parked "along the path where plaintiff ran," (SOF ¶ 11), or parked feet in front of Rivera as he ran toward the light colored sedan, the Court finds that undisputed video footage clearly shows that Rivera threw an object as he was fleeing Jahmi and that the object landed near the left rear side of a light colored sedan parked along the path of Rivera's flight as he ran toward the light colored sedan. (ECF No. 65-9 (Annotated Screenshots Excerpted from Jahmi BWC) at 6-15 (CM/ECF numbering); ECF No. 65-1 (Jahmi BWC) at 22:24:38-45.)

assist in searching the area, and located the bag near the light colored sedan. (ECF No. 65-1 (Jahmi BWC) at 22:25:00 to 22:31:02; ECF No. 65-13 (Djonbalaj BWC) at 22:29:15 to 22:30:16; ECF No. 65-14 (Monte BWC) at 22:24:38 to 22:30:17; ECF No. 65-15 (Beydoun BWC) at 22:24:38 to 22:30:17.)

The following screenshots, citing notes 28–31 and excerpted from undisputed body worn camera footage of Jahmi, Djonbalaj, and Monte, show the undeniable similarities between the bag thrown by Rivera and the bag discovered minutes later by Djonbalaj. The first, second, and third screenshots below show the bag within a superimposed rectangle, near the rear of the light colored vehicle along Rivera's flight path. The fourth screenshot below shows the bag after it was recovered near the light colored sedan.



---

28    (ECF No. 65-9 at 14; *see also* ECF No. 65-1 (Jahmi BWC) at 22:24:45.)

29    (ECF No. 65-13 (Djonbalaj BWC) at 22:29:59 (emphasis added).) Rivera contends that "no bag or object is discernable" on Djonbalaj's body worn camera



Once more, viewing the facts "in the light depicted by the videotape," the Court finds that the bag Rivera threw away from his person while running is the same bag that officers recovered minutes later from under a nearby sedan. *Scott*, 550 U.S. at 381; (ECF No. 65-1 (Jahmi BWC) at 22:24:42-45, 22:31:04; ECF No. 65-13

_____

(ECF No. 69 at 12), but that is not the case.  The bag is discernable in the superimposed rectangle in the screenshot citing this note and the screenshot citing note 30, *infra*, which are both excerpted from Djonbalaj's body worn camera footage.  Even if the bag were not discernable on Djonbalaj's body worn camera, other undisputed body worn camera footage shows that the bag landed near the left rear side of the light colored sedan parked along the path of Rivera's flight, and that the bag was recovered where it appears to have landed.

[30]     (ECF No. 65-13 (Djonbalaj BWC) at 22:29:59 (emphasis added).)

[31]     (ECF No. 65-14 (Monte BWC) at 22:30:16.)

(Djonbalaj BWC) at 22:29:59; ECF No. 65-14 (Monte BWC) at 22:30:16; ECF No. 65-9 at 6-15 (CM/ECF numbering)).

### 3. The Bag Discovered and Retrieved by Djonbalaj Contained Controlled Substances

Although Beydoun and Jahmi did not see Rivera throw anything as they ran after him, their training and experience led them to believe that Rivera threw something, principally based on Rivera's flight. (*See* ECF No. 68-2 (Jahmi Dep.) at 28:18 to 29:2 ("Because he was fleeing, I thought he had a weapon or contraband on his body that he was trying to get rid of."); ECF Nos. 68-4 & 68-5 (Beydoun Dep.) at 89:16 to 90:12 ("The nervousness, the credit card, the fleeing, the smell of marijuana. They all contributed to our training and expertise -- of him fleeing, the smell, and what the bigger picture is. So, this made us search the area for those -- for contraband.").) At the conclusion of Rivera's flight, a search was conducted along the path of his flight, and a bag of what appeared to be illegal drugs was located and recovered from the light colored sedan. (ECF No. 65-1 (Jahmi BWC) at 22:25:00 to 22:31:08; ECF No. 65-13 (Djonbalaj BWC) at 22:29:15 to 22:30:16; ECF No. 65-14 (Monte BWC) at 22:24:38 to 22:30:17; ECF No. 65-15 (Beydoun BWC) at 22:24:38 to 22:30:17.)

The Court finds, based on an abundance of undisputed record evidence, that the bag thrown by Rivera contained controlled substances. First, there is contemporaneous video evidence

showing that the recovered bag itself contained interior bags and vials consistent with "common[] methods of packaging" the controlled substances alleged to have been contained in the bag. (ECF No. 65-1 (Jahmi BWC) at 22:31:20; ECF No. 65-12 (Criminal Complaint) at 3 (CM/ECF numbering).)

The following screenshots, citing notes 32–34, which are excerpted from undisputed footage captured by Jahmi's and Monte's body worn cameras, depicts the interior bags and vials within the recovered bag thrown by Rivera:





---

32    (ECF No. 65-14 (Monte BWC) at 22:30:16.)

33    (ECF No. 65-14 (Monte BWC) at 22:30:17.)



34

Second, as seen and heard on the body worn camera footage of the officers, officers' impression at approximately 10:30 p.m. on February 12, 2021, moments after the bag was recovered, was that the bag contained "a lot of drugs." (ECF No. 65-1 (Jahmi BWC) at 22:31:37-39; ECF No. 65-15 (Beydoun BWC) at 22:30:57-59 ("We found drugs, a big bag.").) Beydoun and Jahmi were also deposed and provided testimony consistent with Beydoun's initial determination. (ECF No. 68-5 (Beydoun Dep.) at 94:17-18; *see also* ECF No. 68-3 (Jahmi Dep.) at 92:5-8.)[35]

Third, Jahmi conducted an inventory of the bag recovered by the police, prepared an arrest report and voucher report, and signed a criminal complaint prepared by an Assistant District

---

[34]    (ECF No. 65-1 (Jahmi BWC) at 22:31:20.)

[35]    The instant case is therefore distinguishable from *Kee v. City of New York*, 12 F.4th 150 (2d Cir. 2021). In *Kee*, the allegedly fabricated information was an officer's disputed assertion that he observed the plaintiff smoking marijuana in a car in which illegal drugs were found prior to plaintiff's arrest. *See Kee*, 12 F.4th at 156, 168, 170-71. Here, unlike in *Kee*, undisputed record evidence, including body worn camera footage, establishes the information that Rivera contends was fabricated.

Attorney ("ADA") for the Brooklyn District Attorney's Office all dated February 13, 2021, which included Jahmi's observation, based on his professional training and experience, that the substances contained in the bag thrown by Rivera and retrieved by the NYPD were crack cocaine, methamphetamine, heroin, oxycodone, Adderall, vilitra, sildenafil, tadalafil, and THC gummies. (*See* ECF No. 65-12 (Criminal Complaint) at 3 (CM/ECF numbering); *see also* ECF No. 65-3 (Arrest Report); ECF No. 65-11 (Voucher Report) (prepared by Jahmi and approved by Freisen).)[36]

To be sure, the record does not reflect if the content of the bag thrown by Rivera and recovered by the NYPD was lab tested for the presence of controlled substances. (CSOF ¶ 14; RCS ¶ 14.)[37] But lab testing is not needed to establish the presence of controlled substances. *See, e.g.*, *United States v. Gladden*, 394

---

[36] To succeed on a summary judgment motion, movants must cite "admissible evidence." *See Kemp v. Regeneron Pharms. Inc.*, 117 F.4th 63, 69-70 (2d Cir. 2024). The February 13, 2021 voucher and arrest reports are admissible under Federal Rule of Evidence 803(8). *See Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991) ("the police report itself [is] admissible as a public record pursuant to Fed. R. Evid. 803(8).") The Court takes further notice of the February 13, 2021 criminal complaint (ECF No. 65-12), but may not consider it for the truth of matters asserted therein. *See Buie v. City of N.Y.*, No. 12-cv-4390(RJD)(CLP), 2015 WL 6620230, at *11 (E.D.N.Y. Oct. 30, 2015) ("The criminal complaint, itself, is inadmissible[.]").

[37] Defendants "deny the assertion[]" that "the narcotics found by Defendant Beydoun were not taken to the crime lab for analysis," citing only the deposition testimony of non-party Delores Sinistaj (who had been the ADA responsible for the prosecution of Rivera). Ms. Sinistaj testified that she had no recollection of Rivera's case. (RCS ¶ 14; ECF No. 68-7 (Sinistaj Dep.) at 6:21-23.) Thus, no party cites record evidence demonstrating whether the contents of the bag were tested for the presence of controlled substances, and the Court need not resolve this dispute because the testing of the contents of the bag thrown by Rivera is immaterial to the claims and defenses at issue in this action.

F. Supp. 3d 465, 472–73 (S.D.N.Y. 2019) (concluding trial counsel did not err in stipulating that recovered drugs were crack cocaine in the absence of lab report results where lay witness who acquired drugs from defendant determined drugs were crack cocaine); *Holley v. Uhler*, No. 16-cv-215(JMA), 2018 WL 9539157, at *11 (E.D.N.Y. Aug. 1, 2018) (finding failure to disclose lab testing issues was immaterial for purposes of a *Brady* claim because lay witness who acquired drugs from defendant testified they believed they purchased cocaine); *United States v. Sykes*, No. 05-cr-6057(CJS), 2011 WL 282356, at *6–7 (W.D.N.Y. Jan. 26, 2011) (finding seized substances were "large amounts of crack cocaine" despite defendant's contention that "no lab tests were ever performed on the evidence seized"). Thus, Defendants need not show lab testing to defend Rivera's claim of denial of fair trial based on fabricated evidence. *See, e.g.*, *Fowler-Washington v. City of N.Y.*, No. 19-cv-6590(KAM)(RER), 2023 WL 2390538, at *3, *7–8 (E.D.N.Y. Mar. 7, 2023) (granting summary judgment where fair trial plaintiff presented no evidence that December 16, 2017 criminal complaint charging criminal possession of marijuana was based on fabricated information, even where lab results were not returned until January 27, 2018); *see also Fowler-Washington*, No. 19-cv-6590, ECF No. 95-2 (NYPD Laboratory Report).

In any event, "there can be 'no genuine issue as to any material fact'" when a "party [that] will bear the burden of proof

at trial" "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *El-Nahal*, 835 F.3d at 252. Thus, even if lab testing was needed to establish whether the bag thrown by Rivera and recovered by the NYPD contained controlled substances, the absence of lab testing shows Rivera's inability to create a genuine issue of material fact as to the second element of his fair trial claim, i.e., whether Beydoun deliberately fabricated evidence, further demonstrating why summary judgment is appropriate on Rivera's fair trial claim. *See, e.g.*, *Davis-Guider*, 2024 WL 5199294, *3 (district court properly granted summary judgment where plaintiff did "not point[] to any evidence showing that Defendants knowingly used inaccurate evidence").

Rivera contends that summary judgment on his fair trial claim is inappropriate because Djonbalaj's testimony is "internally inconsistent" and "incredible as a matter of law." (ECF No. 69 at 11-12.) Even if Djonbalaj's testimony were to be disregarded, the footage from multiple body worn cameras, the accuracy of which Rivera does not dispute, is uncontradicted in the record and establishes that the bag thrown by Rivera while fleeing Jahmi was the same bag recovered by the NYPD minutes later near the light colored sedan parked where Rivera fled police, and, together with other undisputed evidence, establishes that the bag was found to contain illegal drugs. *See supra* Discussion Section II.A.

Thus, the record, even construed in Rivera's favor, shows that Beydoun did not fabricate the evidence and information submitted to the District Attorney.  Without fabrication, Rivera's fair trial claim based on fabrication necessarily fails.  Thus, summary judgment is warranted as to Rivera's fair trial claim. *See, e.g., Greene v. City of N.Y.*, No. 08-cv-243(AMD)(CLP), 2017 WL 1030707, at *25 (E.D.N.Y. Mar. 15, 2017) (granting summary judgment on plaintiff's fair trial claim because plaintiff's claim that defendant falsified evidence was "sheer speculation, and does not create a material issue of fact for trial"), *aff'd*, 742 F. App'x 532, 534 (2d Cir. 2018) ("A plaintiff cannot defeat a motion for summary judgment with conclusory allegations or conjecture[.]"); *see also El-Nahal*, 835 F.3d at 256–57 (affirming summary judgment where defendants pointed to "'an absence of evidence' to support 'an essential element' of [Plaintiff's] [] claim" (citations omitted)); *see also Caraballo v. City of N.Y.*, 726 F. Supp. 3d 140, 169 (E.D.N.Y. 2024) (granting summary judgment where fair trial plaintiff "failed to put forward any evidence" showing "existence of a genuine dispute of material fact" (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011))).

**B.    Rivera's Arguably Contrary Deposition Testimony Is Blatantly Contradicted by Record Evidence and Does Not Create a Genuine Dispute of Material Fact**

In an unavailing attempt to dispute the record evidence described above, Rivera offers only his own November 9, 2023

deposition testimony in which he answered "No" when asked whether he "ha[d] any drugs or narcotics on [him]" on February 12, 2021, and again answered "No" when asked if he "thr[e]w any drugs to the ground" on February 12, 2021. (ECF No. 68-1 (Rivera Dep.) at 42:10-19, 45:5-7.)   To be sure, a plaintiff's uncorroborated testimony may, in some cases, be sufficient to survive summary judgment, "as long as it is not 'simply incredible,' 'contradictory and incomplete,' or 'so replete with inconsistencies and improbabilities that no reasonable juror could credit it.'"  *Pugh v. Casimir*, No. 18-cv-7350(EK)(RLM), 2021 WL 4463103, at *9 (E.D.N.Y. Sept. 29, 2021) (quoting *Adamson v. Miller*, 808 F. App'x 14, 17 (2d Cir. 2020)) (citing *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005)).   But based on the record before the Court, summary judgment "is warranted [] because Plaintiff's account is both 'replete with inconsistencies and improbabilities,' and contradicted by the [] record." *Id.* (quoting *Jeffreys*, 426 F.3d at 555) (citation omitted).

Specifically, during his November 9, 2023 deposition, Rivera gave ambiguous and conflicting testimony.  Aside from large portions of irrelevant, but nonetheless "inconsisten[t] and improbab[le]" testimony,[38] key portions of Rivera's testimony are

---

[38]    For example, Rivera (i) was unable to identify whether he was the plaintiff or defendant in this action until prompted by his counsel, (ii) had to be reminded of Defendants' identities by opposing counsel, (iii) provided inconsistent responses to basic foundational questions concerning his fitness

contradicted by undisputed video evidence. *Jeffreys*, 426 F.3d at 555. Rivera was initially uncertain that he would be able to accurately testify due his possible mental illness and medications he had taken the morning of his deposition, although he later confirmed that he was prepared to testify. (ECF No. 68-1 (Rivera Dep.) at 12:9 to 14:8 (Rivera initially testified that "since we all have, you know, COVID and stuff like that, everyone has mental illnesses[,] [s]o I don't know what can actually happen," and responded "anything's possible" when asked whether medications he took the morning of his deposition could affect his ability to testify, but later testified that his ability to testify truthfully would not be impacted by any mental illness or medication).)

Critically, Rivera denied throwing anything while fleeing from officers on February 12, 2021. (ECF No. 68-1 (Rivera Dep.) at 45:2-7.) But, as noted above, indisputable video evidence contradicts this testimony and instead clearly shows that Rivera, while fleeing, reached into his pocket with his right hand, removed a bag, and threw the bag to his right. (Annotated Screenshots

---

to testify and preparation for his deposition, (iv) was also unable to remember his only son's age, (v) provided conflicting responses as to the nature of his employment on February 12, 2021, and (vi) although he testified that, on the evening of February 12, 2021, he had driven to the vicinity of 78th Street and 12th Avenue in Brooklyn, New York to pick up a companion for a date, he could not remember the time of the date, the address at which he had arranged to meet his companion, where he drove from, how long he waited for his companion, whether he contacted the companion to let them know that he had arrived, or the name of his companion. (*See* ECF No. 68-1 (Rivera Dep.) at 6:18-23, 10:17-23, 13:1 to 14:25, 18:19-24, 23:20 to 24:1, 24:24 to 29:4, 52:20-24.)

Excerpted from Jahmi BWC) at 6-15 (CM/ECF numbering); ECF No. 65-1 (Jahmi BWC) at 22:24:38-45.)  Similarly, Rivera testified that after he was detained by Jahmi, Jahmi or Beydoun said, "Well -- we ain't got nothing on you.  We're going to let you go."  (ECF No. 68-1 (Rivera Dep.) at 50:11-19.)  The body worn cameras, however, recorded no such statements being made during Rivera's arrest. (*See* ECF No. 65-1 (Jahmi BWC) at 22:24:45 to 22:28:10.)  Thus, the Court finds that Rivera's testimony is "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit" his testimony.  *Jeffreys*, 426 F.3d at 555 (internal quotation marks and citation omitted).

The cumulative effect of Rivera's brief, conclusory, and unsupported denials that he threw a bag while being chased by the police, coupled with his vague and confused testimony on immaterial issues described above, *supra* note 38, and the undisputed video footage of the police and Rivera prior to his arrest, warrant the granting of Defendants' motion for summary judgment on Rivera's fair trial claim.  *See Pugh*, 2021 WL 4463103, at *13 (collecting cases in which summary judgment was granted based upon contradictory factual allegations submitted by plaintiffs); *accord Jeffreys*, 426 F.3d at 554-55 (affirming grant of summary judgment where "nothing in the record [] support[ed] plaintiff's allegations other than plaintiff's own contradictory and

48

incomplete testimony" because "no reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made" by the plaintiff).  More specifically, Rivera's testimony does not create a genuine dispute of material fact as to fabrication, the only element of his fair trial claim in dispute.  Because there is no evidence that either the bag that Rivera threw or the contents of the bag were fabricated, Rivera's fair trial claim based on fabrication necessarily fails.  *See, e.g.*, *Davis-Guider*, 2024 WL 5199294, *3; *see also Lauderdale*, 2018 WL 1413066, *8-9.

In sum, the Court finds that Rivera's two one-word denials when asked whether he was in possession of "drugs" and whether he threw any "drugs" on February 12, 2021 (ECF No. 68-1 (Rivera Dep.) at 45:5-7) -- offered during his November 9, 2023 deposition nearly three years after his February 2021 arrest, and which appear within a deposition transcript riddled with inconsistent statements, vague statements, and statements blatantly contradicted by video and other evidence -- amount to "inconsistent and contradictory statements [that] transcend credibility concerns and go to the heart of whether [he] has raised *genuine* issues of material fact." *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) (emphasis retained); *Gewirtzman v. Markowitz* (*In re Mosdos Chofetz Chaim Inc.*), No. 22-2926, 2023 WL 6532954, at *2-3 (2d Cir. Oct. 6, 2023) (affirming summary judgment where "no

reasonable jury could credit the opposing party's testimony"
(alterations adopted) (quoting *Jeffreys*, 426 F.3d at 551));
*D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) ("wholly
fanciful" testimony will not defeat a motion for summary judgment);
*cf. Steinbergin v. City of N.Y.*, No. 21-536, 2022 WL 1231709, at
*3 (2d Cir. Apr. 27, 2022) (district court properly granted summary
judgment where plaintiff denied selling drugs to an undercover
officer because "[a]t most, this allegation (if credited) [*sic*]
would support a reasonable inference that the arresting officers
mistakenly identified [plaintiff] instead of the real seller, but
it cannot alone support a claim that any of the defendants
fabricated evidence").[39]

Here, Rivera presents no evidence of fabricated information,
and his denial of a fair trial claim fails as a matter of law.
*See, e.g.*, *Greene*, 2017 WL 1030707, at *25; *El-Nahal*, 835 F.3d at
256-57.

For the foregoing reasons, the Court **GRANTS** Defendants'
motion for summary judgment as to Rivera's fair trial claim.[40]

---

[39] For the same reasons that Rivera's two one-word denials do not create a genuine dispute as to whether Rivera threw a bag containing illegal drugs that was later recovered by the NYPD, Rivera's testimony that Beydoun threatened to "charge [Rivera] with drugs" if he did not provide a bribe, (*see* ECF No. 68-1 (Rivera Dep.) at 70:14 to 73:20), though disturbing if true, does not create a genuine dispute as to whether evidence was fabricated. Undisputed record evidence establishes that the bag thrown by Rivera and recovered by the NYPD contained illegal drugs. *See supra* Discussion Section II.A.

[40] Because the Court finds that Rivera has not established the elements of a fair trial claim, it need not consider Defendants' alternative argument that Beydoun "is entitled to qualified immunity with respect to plaintiff's denial

### III. SECTION 1983: MALICIOUS ABUSE OF PROCESS CLAIM AGAINST BEYDOUN (COUNT THREE)[41]

For the reasons set forth below, Defendants' motion for summary judgment as to Rivera's malicious abuse of process claim is granted.

Under New York law, an abuse of process claim requires a plaintiff to establish that a defendant "(1) employed regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Zappin v. Cooper*, No. 23-156, 2024 WL 3084015, at *2 (2d Cir. June 21, 2024) (alterations adopted) (quoting *Savino v. City of N.Y.*, 331 F.3d 63, 76 (2d Cir. 2003)). "The same elements apply to a § 1983 claim" for malicious abuse of process, "but the plaintiff must also show the deprivation of a constitutional right." *Lopez-Motherway v. City of Long Beach*, No. 20-cv-5652(BMC), 2021 WL 965158, at *4 (E.D.N.Y. Mar. 15, 2021) (internal quotation marks and citation omitted). Thus, "[t]o survive a motion for summary judgment in this case, the Court must find that, taking the record in the light most favorable to" Rivera, "the facts suggest that the defendant[] misused process

---

of the right to a fair trial claim." (ECF No. 67 at 10.) *But see Garnett v. Undercover Officer C0039*, 838 F.3d 265, 276 (2d Cir. 2016) (qualified immunity generally unavailable as defense to fabrication claims).

[41]    Count Two is discussed below, *see infra* Discussion Section IV.

for an improper purpose." *Rao v. City of N.Y.*, No. 14-cv-7422(RRM)(LB), 2018 WL 1582289, at *7 (E.D.N.Y. Mar. 29, 2018); *see also Kraft v. City of N.Y.*, 696 F. Supp. 2d 403, 416 (S.D.N.Y. 2010), *aff'd*, 441 F. App'x 24 (2d Cir. 2011).

In moving for summary judgment on Rivera's malicious abuse of process claim, Defendants contend that "[t]here was probable cause to arrest and prosecute plaintiff, which defeats plaintiff's malicious abuse of process claim." (ECF No. 67 at 12.) Courts in the Second Circuit are split on the question of whether probable cause is a complete defense to a claim of abuse of process. *Mangino v. Inc. Vill. of Patchogue*, 808 F.3d 951, 958 (2d Cir. 2015) (acknowledging, without resolving, "considerable confusion within our Circuit regarding whether probable cause is a complete defense to a claim of abuse of process under New York law" (footnote and citations omitted)); *Zappin*, 2024 WL 3084015, at *2 (same); *Smith v. County of Nassau*, No. 10-cv-4874(MKB), 2024 WL 4407007, at *7 (E.D.N.Y. Sep. 10, 2024) (citing recent district court decisions reaching conflicting conclusions as to whether probable cause is a complete defense to a malicious abuse of process claim), *appeal docketed*, No. 24-2569 (2d Cir. Sep. 27, 2024). "The Second Circuit has clearly stated, however, that the 'very existence' of confusion regarding whether probable cause constitutes a complete defense to an abuse of process claim establishes that a defendant officer is entitled to qualified immunity when their use of process is

supported by probable cause." *Smith*, 2024 WL 4407007, at *5 (citing *Mangino*, 808 F.3d at 959).

The Court concludes that probable cause defeats Rivera's malicious abuse of process claim on the facts of this case. *See, e.g.*, *Tuccillo v. County of Nassau*, 723 F. App'x 81, 82 (2d Cir. 2018) (noting abuse of process claim "might be defeated by a finding of probable cause"); *Widget v. Town of Poughkeepsie*, No. 12-cv-3459(ER), 2013 WL 1104273, at *9 (S.D.N.Y. Mar. 18, 2013) (dismissing malicious abuse of process claim in part due to the existence of probable cause); *Rios v. City of N.Y.*, 14-cv-894(KBF), 2016 WL 9022590, at *3 (S.D.N.Y. May 17, 2016) ("Defendants are similarly entitled to judgment as a matter of law with respect to Rios's claims for malicious prosecution and malicious abuse of process based on the existence of probable cause for her prosecution." (citing, *inter alia*, *Savino*, 331 F.3d at 72)); *cf. Betts v. Shearman*, 751 F.3d 78, 81 (2d Cir. 2014) ("because arguable probable cause existed to arrest [the plaintiff], his claims for false arrest, false imprisonment, abuse of process, and malicious prosecution were properly dismissed"); *Sullivan v. City of N.Y.*, 690 F. App'x 63, 67 (2d Cir. 2017) ("probable cause to arrest [plaintiff] . . . negate[s] claims of false arrest, malicious prosecution, false imprisonment, and abuse of process").

Here, as Defendants contend and Rivera does not dispute, there was probable cause to effect Rivera's arrest on February 12, 2021.

Specifically, Jahmi, Monte, and Beydoun observed Rivera violate three provisions of New York Vehicle and Traffic Law, obstruct governmental administration, and, as noted above, possess a large quantity of controlled substances. *See, e.g.*, *Jaegly*, 439 F.3d at 152 ("An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." (internal quotation marks and citations omitted)); *Pulk v. Winter*, 722 F. App'x 36, 39 (2d Cir. 2018) (finding probable cause as to obstruction of governmental administration entitled officers to qualified immunity on malicious abuse of process claim); (*see also* ECF No. 65-1 (Jahmi BWC) at 22:23:10 to 22:31:20; ECF No. 65-14 (Monte BWC) at 22:23:10 to 22:31:20; ECF No. 65-15 (Beydoun BWC) at 22:23:10 to 22:31:20.) [42] Although disturbing if true, Rivera's allegations that Beydoun asked Rivera for a bribe in exchange for leniency are neither relevant nor material to the existence of probable cause to arrest, prosecute, or otherwise initiate process because ample evidence was known to arresting officers at the time of Rivera's arrest to

---

[42]    For example, Rivera's obstruction of governmental administration is clearly established by undisputed evidence.  Under New York law, physically breaking off an officer's lawful pat-down, as Rivera did here, qualifies as obstruction of governmental administration under New York law.  *See People v. Darby*, 81 N.Y.S.3d 870, 875 (City Ct. 2018); *accord* N.Y. Penal Law § 195.05(1).

establish probable cause to effect his arrest and prosecution, thereby negating his malicious abuse of process claim. The officers properly proceeded to forward the evidence to the District Attorney. *See Tuccillo*, 723 F. App'x at 82; *Rios*, 2016 WL 9022590, at *3.[43]

Even if probable cause were not a complete defense to Rivera's malicious abuse of process claim in this case, Beydoun is entitled to qualified immunity because, as discussed above, probable cause existed to arrest Rivera and send the evidence to the District Attorney, and a reasonable officer could believe that probable cause is a complete defense to an abuse of process claim under New York law. *See Mangino*, 808 F.3d at 958–59 (affirming district court dismissal of malicious abuse of process claim because the "very existence" of "confusion within [the Second] Circuit regarding whether probable cause is a complete defense to a claim of abuse of process under New York law" established defendant's

---

[43]    Rivera's reliance on *Rao v. City of New York*, No. 14-cv-7422(RRM)(LB), 2018 WL 1582289 (E.D.N.Y. Mar. 29, 2018), is misplaced. (*See* ECF No. 69 at 20-22.)  The plaintiff in *Rao* had adduced evidence from which a jury could infer that the arrest at issue was effected "to extort a bribe" from the plaintiff. *See Rao*, 2018 WL 1582289, at *9.  The Second Circuit has maintained that "[t]he gist of abuse of process is the improper use of process *after* it is regularly issued." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (emphasis added). Here, in contrast to *Rao*, Beydoun's allegedly improper purpose did not arise until *after* Rivera was arrested and processed at the 68th NYPD Precinct. Rivera has cited no evidence to support a finding that Beydoun had any improper objective before or after Rivera was charged, arraigned, and released on his own recognizance on February 13, 2021.  As such, the only legal process that could serve as the basis for Rivera's malicious abuse of process claim is his February 12, 2021 arrest and the forwarding of evidence to the District Attorney, which acts, as noted, were supported by probable cause.

entitlement to qualified immunity); *DuBois v. Cunningham*, No. 21-923, 2022 WL 2186956, at *3 (2d Cir. June 17, 2022) (reversing district court for failing to find defendant was entitled to qualified immunity on malicious abuse of process claim due to the existence of probable cause to arrest plaintiff); *Pulk*, 722 F. App'x at 39 (finding defendant was entitled to qualified immunity on malicious abuse of process claim due to existence of probable cause to arrest plaintiff); *see also Smith*, 2024 WL 4407007, at *6 ("Defendants are entitled to qualified immunity, in view of the confusion as to whether probable cause is a complete defense to an abuse of process claim").

For the reasons set forth above, the Court **GRANTS** Defendants' motion for summary judgment as to Rivera's malicious abuse of process claim.

## IV.    SECTION 1983: FAILURE TO INTERVENE CLAIM AGAINST JAHMI AND MONTE (COUNT TWO)

For the reasons set forth below, Defendants' motion for summary judgment on Rivera's failure to intervene claim is granted.

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014). To support a claim for failure to intervene, and to "overcome the hurdle of qualified immunity," a plaintiff

must show that (1) the officer's failure "permitted fellow officers to violate [plaintiff's] 'clearly established statutory or constitutional rights'" and (2) it was "objectively unreasonable for the officer to believe that his fellow officers' conduct did not violate those rights." *Ricciuti*, 124 F.3d at 129 (quoting *Harlow*, 457 U.S. at 818) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). "In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *accord Lennox v. Miller*, 968 F.3d 150, 158 (2d Cir. 2020). "The essential inquiry is whether, under the circumstances actually presented, an officer's failure to intervene permits a reasonable conclusion that he became a 'tacit collaborator' in the unlawful conduct of another." *Figueroa v. Mazza*, 825 F.3d 89, 107-08 (2d Cir. 2016).

A failure to intervene claim necessarily fails where, as here, there was no constitutional violation against which to intervene. For reasons set forth above, *see supra* Discussion Sections II-III, the Court concludes that Rivera has failed to present evidence that Beydoun fabricated evidence or maliciously abused process against Rivera. Jahmi and Monte therefore had no obligation to intervene. *See Matthews v. City of N.Y.*, 889 F. Supp. 2d 418, 443-44 (E.D.N.Y. 2012) ("the failure to intervene claim is contingent upon the disposition of the primary claims underlying

the failure to intervene claim"); *Coleman v. City of N.Y.*, No. 07-cv-1051(CM), 2010 WL 571986, at *5 (S.D.N.Y. Feb. 2, 2010) (dismissing failure to intervene claims where no underlying constitutional violation was alleged).

Thus, the Court **GRANTS** Defendants' motion for summary judgment as to Rivera's failure to intervene claim.

## V.  STATE LAW CLAIMS (COUNTS FOUR THROUGH SEVEN)

"[A] district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)). "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity' in deciding whether to exercise jurisdiction." *Id.* (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)); *accord Bey v. City of N.Y.*, 999 F.3d 157, 163, 170-71 & n.11 (2d Cir. 2021) (declining request to reinstate state claims "[b]ecause there are no federal claims remaining" following district court's grant of summary judgment); *Oneida Indian Nation of N.Y. v. Madison County*, 665 F.3d 408, 437 (2d Cir. 2011) ("Although the decision whether to decline to exercise supplemental jurisdiction is purely discretionary, . . . we have repeatedly said that if a plaintiff's federal claims are dismissed before trial, the state law claims should be

dismissed as well." (internal quotation marks omitted) (quoting *Carlsbad Tech. Inc. v. HIF Bio Inc.*, 556 U.S. 635, 638 (2009); *Brzak v. United Nations*, 597 F.3d 107, 113–14 (2d Cir. 2010))).

Weighing the values of judicial economy, convenience, fairness, and comity, the Court finds no reason to exercise supplemental jurisdiction over Rivera's remaining claims. No party alleges that New York state courts would be unable to adjudicate this matter. Instead, this matter presents the "usual case in which all federal-law claims are eliminated before trial." *Reyes v. City of N.Y.*, 141 F.4th 55, 64 (2d Cir. 2025) (citation omitted).

Accordingly, Rivera's state law claims are **DISMISSED WITHOUT PREJUDICE** to being refiled in state court.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED. Rivera's state law claims are DISMISSED WITHOUT PREJUDICE to being refiled in state court. The Clerk of Court is respectfully directed to enter judgment and close this action.

**SO ORDERED.**

Dated: September 26, 2025
       Brooklyn, New York

_____
**Hon. Kiyo A. Matsumoto**
United States District Judge
Eastern District of New York